## Mildren *versus* The Pennsylvania Steel Co.

M. brought an action against a steel company, to recover for certain bottoms manufactured and delivered to defendant. The alleged contract, under which the work was done, was based upon an interview between the plaintiff and G. and B., superintendents of the steel works, and a written memorandum made at the time, by G., which set forth the terms on which plaintiff would furnish the bottoms. It was drawn in the form of an agreement but was not signed by any of the parties. M. testified that he understood the memorandum to embody an agreement between him and defendant, and that it was handed him to keep, as evidence thereof. B. testified it was drawn at his instance and for his future guidance and not for the plaintiff, and that he did not deliver it to him. At the trial, it was produced by plaintiff and given in evidence. *Held*, reversing the court below, that the memorandum, having been drawn during the negotiation between the parties, in regard to the very subject-matter in controversy, it was a question for the jury, under the whole evidence, whether it contained the terms of an agreement between the parties, and the fact that it was not delivered did not destroy all its effect as evidence of a contract therein recited.

May 19th 1879.   Before SHARSWOOD, C. J., MERCUR, GORDON and TRUNKEY, JJ.   PAXSON, WOODWARD and STERRETT, JJ., absent.

Error to the Court of Common Pleas of *Dauphin county :* Of May Term 1879, No. 70.

Assumpsit by Edward J. Mildren, doing business as "The Black Lick Manufacturing Company," against the Pennsylvania Steel Company.

The material facts were these : Mildren was engaged in the manufacture of fire-brick and other articles made from fire clay.   The defendant is engaged in the manufacture of steel, and prior to June 1876, had used in its converting departments certain patented machinery and fixtures known as the Haas's bottom.   At that time the defendant contemplated the introduction of some new and supposed better machinery, to take the place of the Haas bottom; and with that view one William Golding, an employee of the defendant, prepared a pattern for a piece of machinery called a bottom, and sent it by express to the plaintiff, with instructions to manufacture two of said articles according to the pattern so furnished.   This was a large hollow article, about four feet in length, and one foot in diameter, with a separated bottom composed of several small pieces, and made to contain molten metal.

On the 14th of June 1876, Mildren was at the steel works of the defendant, when he and Mr. Golding had a conversation in regard to the matter, Golding informing Mildren that the order to manufacture two bottoms had been forwarded to him, and that when made they should be sent to the steel works to see whether they would answer or not.   It was in evidence that after the conversation with Golding, Mildren had an interview with Mr. Bent, the superintendent of the works, and that during the conference the following writing was drawn up by Mr. Golding;

"June 14th 1876.

The agreement between Mildren and P. S. Co. is that Mildren makes one hundred bottoms.   If there is any trouble about royalty the P. S. Co. pays one-half the extra expenses of preparing to make the bottoms, and the P. S. Co. will either stop their order or continue it as they may please.   If there is no trouble, and the bottoms prove satisfactory, and the P. S. Co. order further, then Mr. Mildren bears the total expense of preparation, and puts his price on the bottoms.   The first one hundred bottoms to cost same as Haas's bottoms.   The other bottoms made after to be subject to another second contract that may be made hereafter."

Mildren testified that this memorandum was the result of an arrangement or agreement between the parties, and that he received it with such understanding.   Golding on the contrary testified that it was a mere memorandum for Mr. Bent, and was not intended

for Mildren at all, and not delivered to him. The writing was produced by Mildren at the trial. Shortly after this interview Mildren was at the steel works, when two of the new bottoms had arrived. One had been tried and found unsatisfactory, and the other was tried while he was there and was likewise found to be unsuitable for the purpose required. Mildren proceeded to manufacture the rest of the one hundred bottoms and to deliver them. Bent wrote to ascertain by what authority they were sent, and Mildren replied " By the article of agreement entered into between us," by which was meant the above memorandum. Bent refused to receive the bottoms. and hence this suit. It was in evidence that the two bottoms made and furnished were for mere experiment, and that the manufacture and delivery of the one hundred were to be contingent upon the success of the experiment. There was also evidence that Bent had agreed to pay one-half of the expense in making the original two bottoms, and that Mildren had said $75 would cover the one-half, and that Bent had tendered this amount. On the contrary there was evidence that the expense had been about $400.

At the trial, the court, inter alia, charged:

" Although they talked over the matter between them (Golding and Mildren), when he talked with Mr. Bent, we have no proof of an arrangement at all. * * * Suppose it to be as Mr. Mildren says, an unsigned paper. That does not make it a contract. It is a mere memorandum, as to what is going to be done, or agreed upon. Suppose you were negotiating about the sale of your farm to a man, and the whole thing is talked over, and some person makes a memorandum as to what he thinks the bargain was, and the man goes away and does not contract, the paper made is no contract at all ; it is not binding upon anybody. If it was delivered, still it is not a contract. * * * * If it was not a contract delivered, then it amounts simply to nothing; it is a paper that ought to have no weight in the present case. It was a memorandum of their talk, and not a memorandum of a bargain, if it was not delivered. If what Mr. Mildren said about that being for both sides is correct, still it would be a memorandum for both, though no contract. It is not like the case of a contract which has been drawn up after a full understanding. Even then, until signed, it is no bargain at all ; but it can be used to show what those two men understood at the time."

And again :

" I am speaking now particularly in regard to the delivery of this paper ; for in that is the turning point in this case. * * * If it was not intended that the paper should be delivered, you ought to reject it entirely, and depend altogether upon the memory of the different witnesses. If the paper was drawn for the other parties, but taken away without their knowledge or consent, it

ought not to be treated as a part of the contract. It is true that it was written down by Mr. Golding; but if that was for themselves, and not for Mr. Mildren, it would not be a binding contract at all."

The verdict was for plaintiff for $334.03. After judgment he took this writ, and inter alia, assigned for error the above portions of the charge, which constituted respectively the fourth and fifth assignments of error.

*Hall & Jordan,* for plaintiff in error.

*Gilbert & McPherson,* for defendant in error.

Mr. Justice MERCUR delivered the opinion of the court, October 6th 1879.

This is an action to recover for certain bottoms manufactured and delivered by the plaintiff. In the manufacture of steel, the iron is melted in a cupola, and run into a receiver. Then a blast of air is forced through a perforated bottom, "decarbonizing and oxidizing the molten iron." The action on the bottom by the blast is very destructive, and the object of the experiment in making the bottoms in controversy, was to create some that would endure longer than those previously used.

The main question in the case relates to the alleged contract under which the plaintiff claims the bottoms were manufactured. A conversation relating thereto was had, in which the plaintiff, Mr. Bent, superintendent of the company defendant, and Mr. Golding, superintendent of the Bessamer department, all participated. The evidence is conflicting as to how far Mr. Bent took a part in the negotiation, and also as to the terms of the agreement. A written memorandum was made at the time, by Mr. Golding, setting forth the terms on which the plaintiff would furnish the bottoms. It was drawn in the form of an agreement, but was not signed by any person. The witnesses differ as to the purpose for which it was made. The plaintiff understood it to embody an agreement between him and the defendant, and that, therefore, it was handed to him to keep as evidence thereof. Mr. Bent says it was drawn at his instance and for his future action and guidance, and not for the plaintiff, and that he did not give it to the latter. On the trial it was produced by the plaintiff, and given in evidence. Having been drawn during the negotiation between the parties, in regard to the very subject-matter in controversy, it was a question for the jury, under the whole evidence, whether it contained the terms of an agreement between the parties. If it was not delivered to the plaintiff, that fact of itself did not destroy all its effect as evidence of a contract therein recited. The learned judge, therefore, erred in saying to the jury, "If it was not a contract delivered, then it amounts simply to nothing; it is a paper that ought to have no

[Mildren *v.* Pennsylvania Steel Co.]

weight in the present case." It was some evidence of facts stated during the negotiation. They were, at the very time, reduced to writing by a person taking part in the negotiation, at the instance and in behalf of the defendant. The memorandum did then amount to something, and was entitled to some weight in ascertaining what the parties understood, and what they did at the time of the negotiation. It was also error to say to the jury, when the plaintiff, "talked with Mr. Bent, we have no proof of any arrangement at all." If the evidence of the plaintiff is believed, Mr. Bent did assent to the alleged agreement as set forth in the written memorandum. In so far as the portions of the charge covered by the fourth and fifth assignments are in conflict with the views we have expressed, those assignments are sustained. We discover no substantial error in the remaining assignments.

Judgment reversed, and a *venire facias de novo* awarded.